UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LARRY J. TRUAX, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:05-cv-1913-DFH-TAB |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Larry J. Truax seeks judicial review of a decision by the Commissioner of Social Security denying his claim for disability insurance benefits and supplemental security income under the Social Security Act. Acting for the Commissioner, an Administrative Law Judge ("ALJ") determined that Mr. Truax suffered from depression. The ALJ found, however, that Mr. Truax's depression was not of such a frequency, persistence and intensity that it significantly limited his ability to perform basic work-related activities. The ALJ concluded that the plaintiff was not disabled for purposes of the Social Security Act. On appeal, Mr. Truax claims that substantial evidence does not support the ALJ's finding and that the ALJ applied an erroneous standard of law. For the reasons explained below, the ALJ's decision is affirmed.

*Background*

Larry J. Truax was born in 1941 and was 63 years old when the ALJ denied benefits under the Social Security Act. Mr. Truax has a twelfth-grade education and previously worked as a laborer and welder. R. 92-101.

Mr. Truax alleges that he became disabled on December 30, 1998, though he did not apply for disability insurance benefits and supplemental security income until March 12, 2003. See R. 55-57, 274-76. He claims to have suffered from stress, severe depression, and an inability to concentrate, as well as an inability to tolerate groups of people. See R. 93. Mr. Truax contends that his condition left him unable to perform simple tasks at any job. *Id.*

In November 1998, as he neared the third anniversary of his wife's death, Mr. Truax was examined by Dr. Kenneth Power. He complained of depression and reported that he was having suicidal thoughts. R. 128. Dr. Power arranged for immediate intervention. *Id.* Mr. Truax began to see physicians and received treatment as an outpatient at the Clinton Country Stress Center from mid-November 1998 through at least November 5, 2004 (the last visit that appears in the record). See R. 130-213. On his December 18, 1998 visit, Mr. Truax was diagnosed with "major depression, single episode, severe [illegible] psychosis" and was assigned a Global Assessment of Functioning ("GAF") score of 51-60. See R. 157. (A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. American Psychological

Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed. 2000).)  Over the next few years, Mr. Truax received treatment on and off for his depression.

In April 1999, after working with the staff at the Clinton County Stress Center for several months regarding his depression, Mr. Truax returned to see Dr. Power regarding a cold, severe bronchitis, and depression.  Dr. Power noted: "Since the problem [depression] was last addressed, [t]his problem is stable."  R. 126.  Three months later, in July 1999, Mr. Truax returned to Dr. Power complaining that his "depression was coming back."  R. 124.  Dr. Power prescribed Remeron and trazodone hydrochloride for the recurrent depression. R. 125.

Clinic notes from the Clinton County Hospital provide extensive documentation of Mr. Truax's conditions during this period.  During his check-ups, he would speak frequently of his wife.  See R. 150-53.  During some visits, he reported being emotional and feeling depressed.  See R. 148, 151, 153.  At one point, Mr. Truax reported spending most of his time in bed.  R. 150.  In another visit, he reported that he was "doing about the same."  R. 149.  In other visits, Mr. Truax reported feeling better and seeing a friend for breakfast several times in the week, R. 146, getting more sleep, R. 147, and playing golf, R. 149.

On February 21, 2003, Mr. Truax went to see primary care physician Dr. Tom Stout for a "Disability physical." R. 164. Dr. Stout found no problems on the physical exam but diagnosed "profound and on-going chronic depression" and advised Mr. Truax to "seek Medicare disability." *Id.*

On March 11, 2003, Mr. Truax underwent an initial assessment by psychiatrist Steven Berger, M.D., of the Clinton County Stress Center. This report includes the plaintiff's complaint that he was feeling "stressed out, depressed, nervous" and he would "cry for no reason." R. 168. Dr. Berger diagnosed Mr. Truax with a major depressive disorder, ordered outpatient therapy, and prescribed Lexapro. R. 171-72.

The next day, Mr. Truax submitted his claim for disability insurance benefits and supplemental security income. R. 55, 274. On March 31, 2003, Dr. Berger and Kathy Maxey (Mr. Truax's therapist) signed a letter stating their opinion that "Mr. Truax was unable to work due to his mental condition." R. 213.

After Dr. Berger's assessment, Mr. Truax underwent regular check-ups at the Clinton County Stress Center. Reports from these check-ups run from April 2003 through November 2004. During some of these visits, Mr. Truax complained of depression. On April 1, 2003, he reported that his depression was unchanged, he was sleeping poorly, spent most of his time in bed, and occupied himself with his computer or thoughts of grandchildren when he had suicidal thoughts. R.

131. Occasionally, Mr. Truax mentioned that after feeling better, he would endure bouts of increased depression. See R. 193, 195, 203.

At other points, Mr. Truax indicated that he was becoming more active. For example, on May 9, 2003, he mentioned that his depression was reduced and that he was able to walk two or three times a day. R. 210. He would go see a ball game. *Id.* On May 25, 2003, Mr. Truax reported that his depression was lifting a bit. R. 208. The physician noted that the plaintiff was able to smile a bit and his condition was improving slowly. R. 208. On July 25, 2003, Mr. Truax reported that he was sleeping regularly, playing golf, and walking. R. 204. The doctor noted that Mr. Truax appeared more animated and less depressed. *Id.* On September 22, 2003, he reported that he had more energy and was walking daily, barring illness. R. 202. On November 21, 2003, Mr. Truax mentioned that he was more active and had raked leaves. R. 199. On August 20, 2004, after a period where Mr. Truax had slipped into deeper depression, he reported sleeping better with medication and felt more rested. R. 181. He walked about an hour every day and said he felt great that day. R. 181.

On June 5, 2003, Dr. Kladder, a State Agency psychologist, reviewed the medical evidence and concluded that Mr. Truax showed signs of a depressive syndrome but that the impairment was not severe. R. 106, 109. Based on the review, Dr. Kladder assessed that Mr. Truax had mild restriction of activities of daily living, mild difficulties maintaining social functioning, no difficulties

maintaining concentration, persistence, or pace, and no episodes of decompensation.  R. 116.  On August 13, 2003, Dr. Neville, a State Agency psychologist, reviewed the medical evidence and concurred with Dr. Kladder's evaluation.  R. 106.

*Testimony at the Hearing*

In February 2005, the plaintiff had a hearing before Administrative Law Judge Albert J. Velasquez.  Mr. Truax testified that he had worked at a number of part-time jobs since December 30, 1998, the alleged onset date.  He had worked intermittently as a janitor at a church for several years.  R. 284, 290.  For a brief period of a few days in 2000, Mr. Truax worked providing security at Caterpillar in Lafayette until he was forced to stop due to his nerves.  R. 287, 293.  For a period of several years, Mr. Truax worked on and off as a driver and laborer for a funeral home.  R. 285-86.  On occasion, he took jobs of very short duration, such as helping to set up a store, doing light janitorial work, or assisting his nephew in installing a furnace.  R. 293-95.

As for his domestic life, Mr. Truax testified that he spent much of his time lying around his house.  R. 300.  For meals, he would mostly fix sandwiches and hotdogs because he did not like to cook.  R. 301.  He would allow the dishes and laundry to "stack up pretty good."  *Id.*  He reported going into town to have coffee until the crowd became too large.  *Id.*

The plaintiff's granddaughter testified that she handled many domestic tasks for Mr. Truax, including cleaning, mopping, vacuuming, and landscaping. R. 303. She also handled most of the shopping. *Id.* She also testified that Mr. Truax would become fidgety when out at a small local grocery store. R. 305.

*Procedural History*

ALJ Velasquez issued his decision denying benefits on April 25, 2005. The Appeals Council denied further review of the ALJ's decision, so the ALJ's decision is treated as the final decision of the Commissioner. See *Smith v. Apfel*, 231 F.3d 433, 436 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Mr. Truax filed a timely petition for judicial review. The court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

*The Statutory Framework for Determining Disability*

To be eligible for the disability insurance benefits and supplemental security income he seeks, Mr. Truax must demonstrate that he was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d) and 1382c(a)(3)(A). This showing would be presumed if Mr. Truax's impairments met or medically equaled any impairment listed in Part 404, Subpart P, Appendix 1 of the implementing regulations, and if the duration

requirements were met. 20 C.F.R. § 404.1520(d). Otherwise, Mr. Truax could establish disability only if his impairments were of such severity that he was unable to perform both his previous work and any other substantial work available in the national economy. 20 C.F.R. § 404.1520(f) and (g).

This eligibility standard is stringent. Unlike many private disability insurance programs, the Social Security Act does not contemplate degrees of disability and does not allow for an award based on a partial disability. *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1989). The Act provides important assistance for some of the most disadvantaged members of American society. But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that the claimant has an impairment severe enough to prevent him from performing virtually any kind of work. Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability. The steps are:

(1) Has the claimant engaged in substantial gainful activity? If so, he was not disabled.

(2) If not, did the claimant have an impairment or combination of impairments that are severe? If not, he was not disabled.

(3) If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If so, the claimant was disabled.

>   (4)   If not, could the claimant do his past relevant work? If so, he was not disabled.
>
>   (5)   If not, could the claimant perform other work given his residual functional capacity, age, education, and experience? If so, then he was not disabled. If not, he was disabled.

See generally 20 C.F.R. § 404.1520. When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). If, after any step, the ALJ can determine whether the claimant is disabled or not, it is unnecessary to continue on to the next step. See 20 C.F.R. § 404.1520(a)(4).

*Standard of Review*

If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir.

1994). The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion. *Zurawski*, 245 F.3d at 888. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Also, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351.

*Discussion*

In applying the five-step process, the ALJ found that Mr. Truax satisfied step one because his part-time jobs had not amounted to gainful employment. However, at step two the ALJ denied Mr. Truax's claim. While the ALJ determined that Mr. Truax suffered from "some depression," the ALJ also concluded that this depression was insufficient to constitute a severe impairment. R. 18. At that point, the ALJ stopped the five-step process and did not undertake a more detailed analysis of Mr. Truax's age, education, and experience. Mr. Truax challenges the ALJ's finding that he did not suffer from a severe impairment, arguing that the ALJ's decision was contrary to the applicable laws and regulations, and was not supported by substantial evidence.

I.   *The Legal Standard for Step Two Determinations*

According to Mr. Truax, the ALJ made an error of law by concluding that his depression was not a severe impairment. A reversal and remand may be required if the ALJ applied an erroneous legal standard. *Nelson*, 131 F.3d at 1234. Upon examining the ALJ's opinion, it is clear in this case that his decision was consistent with the applicable legal standard.

At step two, the ALJ must determine whether the claimant suffers from an impairment or a combination of impairments that is severe. 20 U.S.C. § 404.1520(a)(4)(ii). If so, the ALJ then continues with the five-step analysis. If not, the analysis ends there. See *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) ("If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied."). An impairment or combination of impairments is severe if it "significantly limits [an individual's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include, among other things:

1.   Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

2.   Capacities for seeing, hearing, and speaking;

3.   Understanding, carrying out, and remembering simple instructions;

4.   Use of judgment;

5.   Responding appropriately to supervision, co-workers and usual work situations, and

      6.     Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b). Conversely, an impairment is not severe if the "medical evidence establishe[s] only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Social Security Ruling 85-28; see also *Yuckert*, 482 U.S. at 158 (O'Connor, J., concurring) ("Only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking th[e] vocational analysis.").

In the present case, the ALJ found that Mr. Truax's depression was not a severe impairment, concluding that the record "fails to show these conditions would interfere with the claimant's ability to perform basic work activities." R. 16. The ALJ's phrasing was not a verbatim recitation of the step two standard stated in SSR 85-28, but his use of the phrase "interfere with" does not show a departure from the "significantly limits" term used in that ruling. The ALJ's more formal findings at the end of the opinion quoted the applicable standard. The ALJ did not apply an incorrect legal standard.

II.    *Substantial Evidence*

Mr. Truax further contends that the ALJ failed to consider properly several key pieces of evidence in this case. The ALJ must consider all relevant evidence, and the reasons for the ALJ's conclusion must be stated in a manner sufficient to

-12-

perform informed judicial review. *Briscoe*, 425 F.3d at 351. The ALJ must discuss all relevant lines of evidence, see *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003), though he need not make a written evaluation of every individual piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

      A.    *Dr. Berger's Medical Report from March 11, 2003*

The plaintiff first argues that the ALJ disregarded significant medical evidence in Dr. Steven Berger's medical report from March 11, 2003. It is true that the ALJ's decision makes no specific mention of several items in Dr. Berger's report, including Mr. Truax's history (poor sleep, poor appetite, poor concentration ability, memory deficiencies, and general loss of interest) and the doctor's observations (Mr. Truax exhibited psychomotor retardation, slow behavior, a depressed mood, blunted affect). However, the ALJ is not required to make mention of every detail. See *Massanari, supra*. In fact, the ALJ specifically noted Dr. Berger's report, including several aspects that were favorable to the plaintiff's case. For example, the ALJ noted that on March 11, 2003, Mr. Truax reported feeling "stressed out, depressed, and nervous," and that he "cried for no reason." R. 16. The ALJ also noted that Dr. Berger had diagnosed major depressive disorder, along with a GAF score of 50. R. 17. The record clearly shows that the ALJ considered this evidence in arriving at his decision. The fact that he did not mention a few particulars does not provide grounds for remand.

B.     *Mr. Truax's GAF Scores*

Mr. Truax also contends that the ALJ failed to credit properly some of his Global Assessment of Functioning ("GAF") scores.[1]  On March 11, 2003, Dr. Berger assigned Mr. Truax a GAF score of 50.[2]  R. 170.  At the same time, Dr. Berger indicated that Mr. Truax's highest GAF score from the previous twelve months was 70.[3]  *Id.*  At a psychiatric evaluation by Dr. Aldo Buonanno on May 21, 2003, Mr. Truax's GAF score was again assessed as 50.  R. 122.  Mr. Truax argues that the two GAF scores of 50 strongly indicates that the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities.  In other words, Mr. Truax argues that his two GAF scores of 50 are persuasive evidence that he suffers from a severe impairment and that the ALJ erred by stopping at step two of the disability determination.

The court concludes that the ALJ's finding at step two was supported by substantial evidence.  The ALJ did not ignore or discredit the plaintiff's GAF scores in reaching a decision.  The ALJ explicitly examined and considered each of the

---

[1]The GAF scale reflects a "clinician's judgment of the individual's overall level of functioning."  See American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th ed. 2000).

[2]A GAF score of 50 indicates that a person suffers from serious symptoms or any serious impairment in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* at 34.

[3]A GAF score of 70 indicates that a person has some mild symptoms or some difficulty in social, occupational, or school functioning, but generally is functioning pretty well and has some meaningful interpersonal relationships. *Diagnostic and Statistical Manual of Mental Disorders* at 34.

cited scores.  R. 17.  However, the ALJ did not simply accept the scores as conclusive of the severity of Mr. Truax's impairments.  Instead, the ALJ properly viewed the GAF scores in light of the entire body of available evidence, medical and otherwise.  The same March 11, 2003 evaluation that yielded a GAF score of 50 also noted that the plaintiff's memory was reported to be intact, with insight and judgment fair.  R. 170.  Mr. Truax's attention span was normal, thought processes were logical, and orientation was intact.  *Id.*  The May 21, 2003 evaluation that yielded a GAF score of 50 also noted that Mr. Truax was able to take care of personal needs, watched television, and still drove to town.  R. 121.

Psychiatric clinic notes taken in eight subsequent examinations between July 25, 2003 and November 5, 2004 paint the picture of a patient who was not constantly debilitated by his depression.  Mr. Truax was able to play golf on occasion and was walking half an hour a day.  Mr. Truax also was receiving medication for his depression at the Open Door Clinic, and he reported feeling better.  Mr. Truax also raked leaves, trimmed bushes, went to ball games, and watched old movies.  He reported doing some part-time work during the period of claimed disability.

The ALJ determined, looking at the entire body of evidence, that Mr. Truax's depressive symptoms were not "severe" for purposes of step two.  Rather, these symptoms came and went in relation to Mr. Truax's activity level.  R. 18.  The ALJ then went on to conclude that although the evidence suggests Mr. Truax did in

fact suffer from depression, his symptoms were not of the "frequency, persistence, and intensity to fall within the definition of a severe impairment." *Id.*

The plaintiff notes that the ALJ must build a logical bridge from the evidence to his conclusion. *Dixon*, 270 F.3d at 1176. In this case, the ALJ built that bridge. In light of the numerous positive episodes recorded after March 11, 2003 and May 21, 2003, the GAF scores from those dates essentially represent two of the low ebbs in an otherwise up-and-down struggle with depression. The ALJ's interpretation of the evidence may not be the only possible one. However, his interpretation, buttressed by substantial evidence, cannot be displaced by this court. See *Binion*, 108 F.3d at 1176.

### C. *Letter from Dr. Berger and Kathy Maxey*

Mr. Truax also claims that the ALJ misinterpreted a letter dated March 31, 2003, co-signed by Dr. Berger and the plaintiff's therapist, Kathy Maxey. They wrote that "Mr. Truax is unable to work due to his mental condition." R. 213. The ALJ made note of this letter in his opinion. R. 17. However, according to the plaintiff, the ALJ mistakenly believed that this letter originated from Ms. Maxey and was merely expressing her second-hand knowledge of Dr. Berger's opinion.[4]

---

[4]The ALJ wrote that a "report from the claimant's therapist of March 31, 2003, stated it was her opinion and the claimant's psychiatrist's opinion that the claimant was unable to work because of his mental condition." R. 17.

To the extent that the ALJ's discussion of this letter is open to some degree of interpretation, it does not rise to a level that demands action by the court. The court will reverse an ALJ's decision when it "is unreliable because of serious mistakes or omissions." *Sarchet*, 78 F.3d at 308. In this case, even if the ALJ incorrectly attributed the authorship of the letter, such an error is not serious and did not render the ALJ's ultimate decision unreliable. As the ALJ later noted in his opinion, he did not find support in the doctor's other reports for the bare assertion that "Mr. Truax is unable to work due to his mental condition," and he found the assertion was inconsistent with the doctor's clinical findings. In light of the substantial evidence supporting the ALJ's reasoning, this potential error does not raise doubts about the ALJ's ultimate decision.

> D.   *Testimony of Mr. Truax's Granddaughter*

The plaintiff also points to statements by his granddaughter, Alicia Asher. Ms. Asher testified before the ALJ that she took care of almost all of Mr. Truax's domestic chores, such as cleaning, mopping, vacuuming, and shopping. R. 303-04. Ms. Asher also reported to the disability claims adjudicator that Mr. Truax would often repeat things to her and did not recall what he had already told her. R. 76. According to the plaintiff, this evidence is consistent with depression.

The ALJ considered adequately Ms. Asher's evidence. The ALJ discussed her statements to the State Agency and her testimony in the administrative hearing that was consistent with a finding of depression. R. 18. Nevertheless, the

ALJ reasonably concluded, based on the entire body of evidence, that Mr. Truax's depression did not rise to the level of a severe impairment. This body of evidence included statements from Ms. Asher regarding Mr. Truax's rapt attention when watching old movies, his ability to operate kitchen appliances, and the fact that he could drive around town without getting lost. R. 18. The court find no reason to disturb the ALJ's ultimate decision in this case.

*Conclusion*

For the foregoing reasons, the ALJ's decision denying benefits is supported by substantial evidence and does not reflect a legal error that would require remand. Accordingly, the ALJ's decision is affirmed. Final judgment will be entered accordingly.

So ordered.

Date: September 29, 2006

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

James F. Roth
jim@jimrothlaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov